UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

ALICIA TONDREAU-LEVE,

     Petitioner,

v.                                 **Case No. 8:25-cv-229-MSS-SPF**

SECRETARY, DEPARTMENT
OF CORRECTIONS,

     Respondent.

_____/

## O R D E R

Tondreau-Leve filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254 challenging her state court convictions for racketeering, conspiracy to engage in racketeering, dealing in stolen property, and money laundering. After reviewing the petition (Doc. 1), the response (Doc. 8), the reply (Doc. 9), and the relevant state court record, the Court **DENIES** the petition.

## PROCEDURAL HISTORY

A jury found Tondreau-Leve guilty of racketeering, conspiracy to engage in racketeering, dealing in stolen property, and two counts of money laundering. (Doc. 8-2 at 834–39) The trial judge sentenced Tondreau-Leve to twenty years in prison for the racketeering conviction, a concurrent twenty years in prison for the racketeering conspiracy conviction, a consecutive twenty years of probation for the dealing in stolen property conviction, and a concurrent twenty years of probation for the money

1

laundering convictions. (Doc. 8-2 at 934–43) Tondreau-Leve appealed, and the state appellate court affirmed. (Doc. 8-2 at 1007)

Tondreau-Leve filed a motion for post-conviction relief (Doc. 8-2 at 1067–98), the post-conviction court denied relief (Doc. 8-2 at 1101–05, 1967–68), and the state appellate court affirmed in part and reversed in part and remanded the case for a ruling on a claim overlooked by the post-conviction court. (Doc. 8-2 at 2029–30) On remand, the post-conviction court denied relief (Doc. 8-2 at 2043–44), and the state appellate court affirmed. (Doc. 8-2 at 2071)

Tondreau-Leve's federal petition followed. In her federal petition, Tondreau-Leve asserts that trial counsel deficiently performed by not objecting to the trial judge's consideration of her lack of remorse at sentencing. (Doc. 1 at 5)

### FACTS[1]

Evidence at trial proved that Tondreau-Leve purchased baby formula from persons who obtained the formula from the State of Florida's Woman, Infants, and Children program. The WIC program is a federally funded program that provides food to poverty-stricken families without cost. Also, Tondreau-Leve purchased baby formula from persons who stole formula from grocery stores. Tondreau-Leve resold the formula for a profit to buyers who lived in other states.

Tondreau-Leve and her husband advertised the formula on Craigslist through a business called Formula Mom. An auditor with the WIC program called a telephone

---

[1] This summary of the evidence derives from Tondreau-Leve's and the State of Florida's briefs on direct appeal. (Docs. 8-2 at 955–62, 975–93)

number on an advertisement, spoke with Tondreau-Leve, informed her that she was unlawfully selling the formula, and asked her to stop. Tondreau-Leve admitted that she purchased the formula from persons in the WIC program, denied that she was acting unlawfully, and refused to stop selling the formula.

Tondreau-Leve purchased baby formula from an undercover police officer. After purchasing small quantities from the officer, Tondreau-Leve purchased three thousand cans of formula wrapped in six pallets with stickers identifying a grocery store as the owner of the product. During the sale, Tondreau-Leve removed from a pallet a sticker that identified the grocery store as the owner of the product and gave the sticker to her husband. Tondreau-Leve paid $33,000.00 in cash to the undercover officer for the formula. The retail value of the formula was over $100,000.00.

Tondreau-Leve kept formula that she purchased in a storage unit that was not air conditioned. She recruited other persons to purchase stolen formula and formula from the WIC program. She told recruits that she did not want to know how they obtained the formula. She showed a recruit how to use rubbing alcohol to wipe off an expiration date on a can of formula. She told several recruits that she purchased formula from drug addicts who needed money to purchase drugs. She told a recruit that the recruit should not keep formula in her car because police could seize the formula and arrest the recruit for possessing the formula.

3

## STANDARDS OF REVIEW

**AEDPA**

Because Tondreau-Leve filed her federal petition after the enactment of the Antiterrorism and Effective Death Penalty Act, AEDPA governs her claim. *Lindh v. Murphy*, 521 U.S. 320, 327 (1997). AEDPA amended 28 U.S.C. § 2254(d) to require:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the U.S. Supreme Court] on a question of law or if the state court decides a case differently than [the U.S. Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the U.S. Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. Clearly

4

established federal law refers to the holding of an opinion by the U.S. Supreme Court at the time of the relevant state court decision. *Williams*, 529 U.S. at 412.

"[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 693 (2002). A federal petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

**Ineffective Assistance of Counsel**

Tondreau-Leve asserts ineffective assistance of counsel — a difficult claim to sustain. *Strickland v. Washington*, 466 U.S. 668, 687 (1984), explains that a petitioner must demonstrate both deficient performance and prejudice:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

"There is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*,

5

466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To demonstrate prejudice, "the defendant must show that there is a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." *Hill*, 474 U.S. at 59. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690–91. A defendant cannot meet his burden by showing that the avenue chosen by counsel was unsuccessful. *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992).

Because the standards under *Strickland* and AEDPA are both highly deferential, "when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. "Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'" *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) (citation omitted).

## ANALYSIS

**Ground One**

Tondreau-Leve asserts that trial counsel deficiently performed by not objecting to the trial judge's consideration of her lack of remorse during sentencing. (Doc. 1 at 5, 17) The post-conviction court denied the claim as follows (Doc. 8-2 at 1967–68):

> Defendant argues that counsel failed to object when the court considered the Defendant's lack of remorse during sentencing. The State responded that the claim was conclusory and speculative at best. The State pointed out that the Court used the correct standard during sentencing . . . . After review of the State's response, incorporated herein, the Court agrees.

In the response to Tondreau-Leve's motion for post-conviction relief, the prosecutor presented the following argument (Doc. 8-2 at 1228–29) (state court record citations omitted):

> [Tondreau-Leve's] claim is wholly conclusory; based upon nothing more than self-serving speculation. [Tondreau-Leve] has failed to demonstrate either prong under *Strickland*; thus, this claim should be denied without the necessity of an evidentiary hearing.
>
> Prior to imposing [a] sentenc[e], Judge Durden clearly articulated the correct legal standard for imposing [a] sentenc[e], stating:
>
> > Florida Statutes clearly indicate that the primary purpose of sentencing is punishment and other considerations being secondary or ancillary to that.
>
> Judge Durden goes on to highlight [Tondreau-Leve's] lack of concern. During his remarks below, he focuses on the lack of concern that [Tondreau-Leve] showed for others,

even though he uses the word remorse in the final sentence.

[Trial judge:]     I find it kind of interesting here and while I empathize with — and I'm going to speak to both defendants, even though I'm only addressing Mrs. [Tondreau-Leve]. But both parents obviously have great concern for their family and other family members, as is understandable, and there's certainly nothing wrong with that. Any parent would have great concern for their children, for their own parents, especially if they're sick and elderly and getting on in years. But I find it curious during Ms. [Tondreau-Leve's] statement that there wasn't a single word about your impact on others besides yourself, or your own family members. No concern expressed for other mothers, for the people that were wrapped up in your scheme, and the effect this had on them, for infants who may have been deprived of formula, for infants who may have ended up with tainted formula having been shipped out of state. Remarkable that there wasn't a single word of remorse or regret for anyone other than yourself and your immediate family. That concerned me.

At sentencing, Tondreau-Leve's sister and son asked the trial judge for leniency because Tondreau-Leve's two teenaged sons needed her care. (Doc. 8-2 at 853–64) A director of loss prevention and safety for a grocery store asked the trial judge to impose the maximum sentence because Tondreau-Leve recruited others to steal from the grocery store, the grocery store expended significant resources to

8

investigate the thefts, and the grocery store lost over $1,000,000.00 from the thefts. (Doc. 8-2 at 868–72) A director of the WIC program asked the trial judge to impose the maximum sentence because Tondreau-Leve's crimes prevented infants in impoverished families from receiving adequate nutrition and because Tondreau-Leve preyed on impoverished families who needed money. (Doc. 8-2 at 873–78)

At sentencing, Tondreau-Leve requested leniency as follows (Doc. 8-2 at 881–90):

[Tondreau-Leve:]     Hi, good afternoon, Judge Durden.

[Trial judge:]     Good afternoon.

[Tondreau-Leve:]     Through this whole trial, I haven't been able to — you haven't been able to see who I am. Some of the letters that you have received tell you a little bit about myself and quite a bit about who I am, how I was raised.

Your Honor, I was raised in a strong Catholic home. My father was a police officer. My mother was a stay-at-home mom. You know, we did — we did family vacations. You know, I never got in trouble with the law before. I was afraid to. My father was a police officer. I couldn't — you know, I knew right from wrong.

You know, skipping over my teen years, you know, when I first met my husband, Alan,

you know, and we got married — actually, before that my mother was diagnosed with breast cancer. You know, I spent eighteen years caring for her, me and my father. My sisters, they lived out of state, but it was really me and my father. We took care of her. We were running into Boston all the time bringing her to appointments.

I remember having my youngest son — he arrived five weeks early. Like, within a week of delivering him, I was on my mother's bed at Beth Israel Hospital holding her hand because she had just found a tumor in her neck, and she had to get surgery.

You know, it didn't — you know, this is the type of person that I was. You know, I took care of people. I took care of my mother. I took care of my grandmother growing up. I take care of my father who is here in court. He's eighty-six years old. He's a snowbird. He comes down during the winter. He lives in Treasure Island. I run back and forth if he needs me. I'm there for him. You know, he has pneumonia several times, and I just run down and make sure he's okay.

You know, raising my two boys, I followed in my mother's footsteps. I was a stay-at-home mom. My husband worked. He

10

was the breadwinner of the family. I pride myself on — you know, I never said I don't have any value, because I do have — I do have value. I always had value in raising my kids.

You know, you saw my son come up here. You know, he's a junior at Stetson University. He's really supposed to be a sophomore. Why? Because, you know, he was encouraged to take all these AP classes in school, and he was able to skip over a year of college. So, now he's a junior.

Originally, he wanted to go to Stetson because he wanted to be a lawyer. He saw [ ] how it was. He saw how it ran. And he said, "You know, Mommy, I don't really know if I want to be a lawyer, because I don't have" — well, backing up, being in the mock trial club, when you start competing, you're chosen to be either on the prosecution side or the defense depending on the competition you're at, at which school.

And you know, he — he was chosen sometimes as a witness for the prosecution. He said, "I don't know if I can be a lawyer," he said, "because you have to put your heart aside, and I'm too sensitive. I'm too sensitive to do that."

11

I said, "Well, Tyler, you don't have to be a trial attorney. You know, you can be a corporate attorney."

So, he said, "Well, that's a good idea." So, he decided he's going to be a finance major with a track of law. You know, he went and visited the law school down in St. Pete, and the students, you know, told them a lot about the school, and you know, what to expect in case you go into law.

And he said, "You know, they all said they're really cut-throat. They really" — you know, and I don't know if this was just his impression or not, but it sort of deterred him from going into law.

And I said, "You know, don't — you know, you need to still stay focused. You know, go with what your heart says."

You know, he got these qualities from me and my husband. I mean, I have been home with them for their whole life. I have instilled — you know, he read — this is the first time I heard his letter that he sent to you, and it makes a parent really proud when your child actually can write something that you have taught them. And you don't know if — you don't know if you have gotten across to them all the values that you want

12

them to be. You know, not just, you know, a bright student because, you know, bright is fine, but you have to have a heart. You have to have a heart in life. You can't, you know, just be out for me, me, me.

And when I heard him read that letter, I was, like, wow, he actually — he got what I was trying to teach him. He got what I was trying to teach him.

You know, my other son, he's a totally different student — different person than my son, Tyler. He's very focused. You know, like his brother says, he's a musician, wonderful jazz musician, plays the saxophone. Again, he's a 4.0 student. He's in the marching band. He's got all AP classes.

You know, he's preparing for college right now, which is really difficult. You know, I've brought him on tours of colleges over the last year before I was incarcerated. And, you know, he strives to go to Brown University. That's where his number one school is.

You know, we have all raised children, but when you can actually say, you know, the job that you have done has made this individual, and you're proud of them — and that's really something. And I'm proud. I'm so proud of my kids,

13

and I would never teach them wrong.

I didn't cry when Tyler read his letter. My husband cried. I didn't cry because I have always been the matriarch of the family, always the glue, the strong one. Maybe that's the mother's role when she's a stay-at-home mom. My heart was tearing up inside. You know, I just wanted to get up and wrap my arms around him and say, "It's okay, Tyler. It's okay."

I don't want to be taken away from my kids. I still feel — I thought I would put up a wall and not let anybody in, get close to me after all of this. I said, you know, I can't trust people out there. I don't know who to trust. I don't know who not to trust.

And I have tried that, but that's not who I am. My first priority is to give to people, and I got hurt by it. I got hurt by a lot of people. But I don't want it to change who I am, and I don't want my children to change who they are.

You know, I still give — you know, like my husband said, we're caregivers of his father. And I was able to talk to him for the first time last weekend. He's in — he's in assistive — he's in a rehab right now for his broken hip, and my son went by to see him. And I called at the same

14

time, and I was able to talk to him. It was the first time I had said hi to him in seven weeks.

And, you know, I apologized. I felt like I abandoned him. And he said, "Oh no, you didn't abandon me."

But I want to be there. We would go and take care of his needs. Every other day [we] would be in Melbourne just taking care of him, bringing him what he needs there.

You know, like I said, I'm a giving person. And I ask the court, you know, if I have to be punished for what I have been charged for, I accept that. But you have the final decision, Judge Durden. I know you can give me something that would allow me to still be at home with my family. I know you can — whether it's house arrest or a long-term probation, you know, I can — I can go volunteer wherever you would like, Salvation Army, forever if you want, because — and I would enjoy doing that.

I don't feel by locking me up with hard criminals would be a service to anybody where I could give back to the court more of myself by giving to more people. So, at this time, I would really like to plead to the court to extend leniency towards me, whether it be house arrest or

15

probation. I know you've done that before, and I would really like for you to consider my position and to keep me with my family, my sons, so that I can continue to direct them in the right direction.

I have my family here. You have seen my sisters here, both my sisters, my brother, my father. They all flew in for me. You know, this is the core of my family. This is who we are. We have these people who are supporting me, and that's what I have done all my life for everybody else.

You know, I lost my mother to breast cancer, and three years after I developed breast cancer. And I thought I was going to be taken away from my sons at that time. They were seven and eight years old, and I was very scared that I was going to — I was going to die. But eleven years later, I'm here. And we have all gone through trials and tribulations, but that's what makes us human. Human beings make errors in judgment, or you know, just make poor choices sometimes.

And everybody makes — everybody deserves second chances. I had just recovered from breast cancer, and we were on vacation in Lake George, and there was a mountain that we needed to climb with the boys.

16

> And I struggled. I had just finished my chemo, and I struggled. And I couldn't make it, and I had them encouraging me. And I made it, because the picture at the top of the mountain was the four of us. And I had my baseball cap on because I was bald. And that was our Christmas card that year, and I have still it.
>
> And what it teaches me is you're going to go through trials in life, but you can survive, and that's what I did. So, again, I plead to the court, you know, please consider my request, my husband's request. We're not bad people. We're not bad people at all. I would like to stay home with my children as long as I can.
>
> Thank you, Judge.

After hearing argument from the parties, the trial judge sentenced Tondreau-Leve as follows (Doc. 8-2 at 909–13):

| [Trial judge:] | Ms. [Tondreau-Leve], I'm going to sentence you first. |
| [Trial counsel:] | Do you want us to come forward? |
| [Trial judge:] | Yeah. Why don't you come up here. |
| | All right. The defendant stands before the court having been convicted of five first-degree felonies. Each of those is |

17

punishable by thirty years in state prison, for a total maximum sentence of one-hundred-fifty years in Florida State Prison if the court chose to run those consecutively.

Her scoresheet — I think it came out to about twelve and a half years. That's a low end of guidelines, right?

[Trial counsel:]   Yes, sir.

[Trial judge:]   And with regard to — and counsel kind of acknowledges there's probably less compelling reasons in her case with regard to the co-defendant. However, I have reviewed those reasons, and I don't find any of them applicable in her case. And if any of them were arguably applicable, I don't find that there's a sufficient factual basis that's been established to apply one of those with the requisite degree of proof required by case law in her case.

Some further observations. I think there is a concern raised by some law with a court seeking to send messages, whether it's an argument to a jury to send a message or whether it's an argument at sentencing. I seem to recall something fairly recently in that regard, and I don't think that's the overall purpose or role.

18

To the extent that somebody may derive a message, so be it, but that's not the purpose of the court in determining sentencing. Florida Statutes clearly indicate that the primary purpose of sentencing is punishment and other considerations being secondary or ancillary to that.

I find it kind of interesting here — and while I empathize with — and I'm going to speak to both defendants even though I'm only addressing Mrs. [Tondreau-Leve]. But both parents obviously have great concern for their family and other family members, as is understandable, and there's certainly nothing wrong with that. Any parent would have great concern for their children, for their own parents, especially if they're sick and elderly and getting on in years.

But I find it curious during Mrs. [Tondreau-Leve's] statement that there wasn't a single word about your impact on others besides yourself or your own family members. No concern expressed for other mothers, for the people that were wrapped up in your scheme and the effect this had on them, for infants who may have been deprived of formula, for infants who may have ended up with tainted formula having been shipped out of state. Remarkable that there wasn't a single word of

19

remorse or regret for anyone other than yourself and your immediate family. That concerned me.

This is a case the scope of which makes it impossible to determine restitution. Restitution isn't being sought. Even if it was, it would be virtually impossible to determine who is owed what. The scope and breadth of this was so great over such a period of time involving so many victims that it's just an impossibility. One reason for a downward departure is the need for restitution. That can't even be determined in this case. It would be an impossibility.

All right. You're adjudicated guilty on each of the five offenses. On Counts One and Two, racketeering and conspiracy, you're sentenced to twenty years in Florida State Prison, toward which you'll receive credit for all time served.

On Count Three, dealing in stolen property, [Count] Five, money laundering, and [Count] Six, money laundering, you're sentenced to twenty years of probation to run consecutive with the prison terms and concurrent one with the other for a total of twenty plus twenty.

20

Tondreau-Leve asserts that trial counsel deficiently performed by not objecting to the trial judge's consideration of her lack of remorse during sentencing. (Doc. 1 at 5) At the time of Tondreau-Leve's sentencing, Florida law prohibited a trial judge from aggravating a sentence because of the defendant's lack of remorse. *Pope v. State*, 441 So. 2d 1073, 1078 (Fla. 1983), a capital case, held that "lack of remorse should have no place in the consideration of aggravating factors," and that "[a]ny convincing evidence of remorse may properly be considered in mitigation of the sentence, but absence of remorse should not be weighed either as an aggravating factor nor as an enhancement of an aggravating factor." Also, *Holton v. State*, 573 So. 2d 284, 292 (Fla. 1990), another capital case, further held that "[a] trial court violates due process by using a protestation of innocence against a defendant [during both] the penalty phase [and] the guilt phase under article I, section 9 of the Florida Constitution."

The district courts of appeal extended the holdings in *Pope* and *Holton* to non-capital sentencing hearings. *See Brown v. State*, 27 So. 3d 181, 183 (Fla. 2d DCA 2010); *Bracero v. State*, 10 So. 3d 664, 665–66 (Fla. 2d DCA 2009). *Brown*, 27 So. 3d at 183 (quoting *Ritter v. State*, 885 So. 2d 413, 414 (Fla. 1st DCA 2004)), explained that "'[a]lthough remorse and an admission of guilt may be grounds for mitigation of sentence, the opposite is not true. Reliance on these impermissible factors violates the defendant's due process rights.'"

After Tondreau-Leve's convictions and sentences became final, the Florida Supreme Court considered "whether a trial court's consideration of failure to take

responsibility during a sentencing proceeding necessarily violates a defendant's due process rights" and held "when a defendant voluntarily chooses to allocute at a sentencing hearing, the sentencing court is permitted to consider the defendant's freely offered statements, including those indicating a failure to accept responsibility." *Davis v. State*, 332 So. 3d 970, 971, 978 (Fla. 2021). The Florida Supreme Court determined that *Pope* and *Holton* do not apply to non-capital sentencing hearings because a sentencing judge in a non-capital case does not weigh aggravating circumstances against mitigating circumstances and further determined that the language in *Holton* prohibiting the use of "a protestation of innocence against a defendant" constitutes dicta. *Davis*, 332 So. 3d at 975–76.

**Deficient Performance**

Because *Strickland* requires a judge to evaluate counsel's conduct at the time of representation and without the benefit of hindsight, this Court evaluates the deficient performance prong of Tondreau-Leve's claim with Florida law that applied at the time of her sentencing. *Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time."). *Rambaran v. Sec'y, Dep't Corrs.*, 821 F.3d 1325 (11th Cir. 2016) ("'[W]e have held many times that reasonably effective representation cannot and does not include a [r]equirement to

22

make arguments based on predictions of how the law may develop.'") (citation omitted).

During her allocution at sentencing, Tondreau-Leve asked the trial judge for leniency so that she could care for her father, her father-in-law, and her children. The trial judge considered and rejected her request for leniency because in part Tondreau-Leve failed to consider the impact of her criminal acts on persons other than her family and failed to show remorse or regret for her criminal acts. Because the trial judge did not *aggravate* Tondreau-Leve's sentence because of her lack of remorse and instead rejected her request for leniency because of her lack of remorse, an objection to the trial judge's consideration of remorse would not have succeeded. *Rankin v. State*, 174 So. 3d 1092, 1097 (Fla. 4th DCA 2015) ("Consideration of remorse is, however, appropriate if it occurs during a court's consideration of whether or not to mitigate a sentence.") (citing *Shelton v. State*, 59 So. 3d 248, 250 (Fla. 4th DCA 2011)).

Also, under Florida law, a trial judge may impose a sentence up to the statutory maximum. § 921.002(1)(g), Fla. Stat. ("The trial court judge may impose a sentence up to and including the statutory maximum for any offense . . . .").[2] A trial judge may not impose a sentence below the lowest permissible sentence under the

---

[2] When enacting the current Criminal Punishment Code, the Florida legislature abolished an upward departure. *Davis v. State*, 268 So. 3d 958, 965 (Fla. 1st DCA 2019) ("After the Criminal Punishment Code's enactment, our sentencing statutes no longer 'contemplate upward departure sentences, because generally the statutory maximum sentence is the highest possible sentence for any crime.'") (citation omitted).

23

Criminal Punishment Code unless a defendant demonstrates a valid reason for a downward departure. § 921.0024(2), Fla. Stat. At sentencing, the trial judge determined that the statutory maximum sentence was 150 years in prison and the lowest permissible sentence was twelve and a half years in prison. (Doc. 8-2 at 910)

Trial counsel argued that the trial judge should depart downward from the lowest permissible sentence because the crimes lacked sophistication, the criminal activity was not widespread, and the sale of formula was only a small portion of the company's total business (Doc. 8-2 at 895–98) (bolding added):

[Trial counsel:]    Judge, there's a couple of factors that I believe Mr. Leve, in particular, qualif[ies] for in terms of mitigation. I have to respectfully disagree with the Publix representative. I don't think there was anything sophisticated about this. It's nothing more than placing an ad and paying people money to sell a product. I also disagree that even the evidence supported that any of these people were solicited to [sell].

**I think what the evidence shows is a lack of oversight by my client, Alicia [Tondreau-Leve].** And with Alan Leve, as I stated to the jury, nothing more than doing what he felt was his responsibilities as a husband. To that extent, he was operating under her direction, and his actions are isolated in terms of their scope and were done in a very unsophisticated manner.

I understand where both of them score in the sentencing guidelines. We raised a number of issues that we intend to go forward with [on] appeal. I have

24

prepared appeal paperwork for the end of this, and my office will be electronically filing it. I think I brought courtesy copies of those filings for the Court. I found that I only had Alan's, but they're identical in nature.

**I would ask the Court to consider a below the guidelines sentence for both of them**, but more particularly Alan. He scores, I believe, approximately twenty-one months. I think he would be a good candidate for community control followed by a term of probation. That would allow him to continue to take care of the family obligations.

I understand the mitigating factors in terms of the jury verdict on Alicia [Tondreau-Leve] are not the same as Alan and that there are far fewer grounds for the Court for a downward departure in that situation. But I would ask for nothing more than a guidelines sentence for her.

**Neither of my clients had a criminal history at all in terms of this.** I understand the arguments that are made, that by — or due to the fact that they were offering and, more particularly Formula Mom as a company was offering, to purchase [and] that people took advantage of that.

But I do find it somewhat interesting in terms of this particular case that the individuals who actually committed the thefts and sold to the people [ ] are being characterized as low-level offen[ders] in terms of [ ] suffer[ing]

25

insignificant penalties for actually causing the loss and causing the risk in terms of that.

In terms of the overall business, in terms of the evidence that was presented in this case, **what was presented in terms of criminal activity and proving to be criminal activity based on the total numbers that we're talking about, was a relatively small portion of the business.** The argument is that all of it must have been equally bad without any proof to support that, and I believe that the Court needs to make a decision based on the evidence that was presented in terms of the impact of that and then look at that.

The State, while it was a long trial, had the opportunity to try and demonstrate, if they could, that it was more widespread than the people they actually brought in who confessed to stealing and selling. No evidence of that nature was presented. There was a lot of argument made that those must have been equally bad, but the evidence does not necessarily support that.

So, again, I would ask the Court to give consideration to my clients' lack of criminal history, in particular Mr. Leve's role in this, and the mitigating factors that apply to him and sentence accordingly.

A trial judge may depart downward if a defendant demonstrates that "[t]he offense was committed in an unsophisticated manner and was an isolated incident for which the defendant has shown remorse." § 921.0026(2)(j), Fla. Stat. Because

26

trial counsel argued that the lack of sophistication and the isolated nature of the crimes justified a downward departure, the trial judge also appropriately considered under Section 921.0026(j), whether Tondreau-Leve and her husband showed remorse for their actions. *Geske v. State*, 378 So. 3d 1199, 1207 (Fla. 2d DCA 2024) ("This is not a case where the trial court equated Geske's exercise of his constitutional rights with a lack of remorse. . . . Rather, it is evident that in determining whether Geske was entitled to a downward departure under Section 921.0026(2)(j), the trial court properly considered whether Geske had shown remorse or accepted responsibility, a necessary requirement for that statutory ground.").

Because an objection to the trial judge's consideration of remorse would not have succeeded, Tondreau-Leve failed to demonstrate deficient performance under *Strickland*. *Pinkney v. Sec'y, Dep't Corrs.*, 876 F.3d 1290, 1297 (11th Cir. 2017) ("[A]n attorney will not be held to have performed deficiently for failing to perform a futile act, one that would not have gotten his client any relief.").

**Prejudice**

At the time of Tondreau-Leve's sentencing, opinions by district courts of appeal prohibited a trial judge from considering lack of remorse at sentencing. After Tondreau-Leve's convictions and sentences became final, *Davis*, 332 So. 3d at 978, held that a trial judge may consider a defendant's lack of remorse if the defendant voluntarily allocutes at sentencing.

*Guzman v. Sec'y, Dep't Corrs.*, 73 F.4th 1251, 1255–56 (11th Cir. 2023), explains that, if a change in state law occurs after a defendant's conviction and sentence

27

becomes final, prejudice under *Strickland* for a claim that turns on state law is

measured against the *new* state law:

> In *Lockhart v. Fretwell*, the Supreme Court faced the same atypical issue animating this appeal: a change in the law. There, as here, the petitioner claimed that his counsel was ineffective for failing to make an objection (at trial rather than on appeal). *Fretwell*, 506 U.S. at 367. And there, as here, by the time the district court decided his federal habeas case, the legal basis for the objection no longer existed because the necessary precedent had been overruled. *Id.* at 367–68. Relying on the older law, the district court granted habeas relief (and the appellate court affirmed) because the omitted objection would have succeeded had it been made at the time of trial. *Id.*
>
> The Supreme Court reversed, holding that a *Strickland* prejudice analysis "focusing solely on mere outcome determination, without attention to whether the result of the proceeding was fundamentally unfair or unreliable, is defective." *Id.* at 369. Put another way, even if a defendant can show "a reasonable probability of a different result" without counsel's error, that is not always the end of the matter under *Strickland*. *See id.* at 369–70. "The essence of an ineffective-assistance claim is that counsel's unprofessional errors so upset the adversarial balance between defense and prosecution that the trial was rendered unfair and the verdict rendered suspect." *Id.* at 369 (quoting *Kimmelman v. Morrison*, 477 U.S. 365, 374, (1986)). Thus, *Strickland* prejudice also requires that the result of a defendant's proceeding be "unfair or unreliable." *Id.*
>
> In refining the prejudice analysis in this way, the Court emphasized that it was "neither unfair nor unreliable" to evaluate the result of an earlier proceeding through the lens of current law. *Id.* at 371. More specifically, no prejudice exists "if the ineffectiveness of counsel does not deprive the defendant of any substantive or procedural right to which the law entitles him" — present tense. *Id.* at 372 (emphasis

28

added). So, unless the defendant would be entitled to habeas relief under current state law, there is no prejudice.

In *Guzman*, 73 F.4th at 1254, the petitioner asserted that appellate counsel deficiently performed by not arguing on direct appeal that the trial judge erred by failing to instruct the jury on excusable homicide. At the time of Guzman's direct appeal, an opinion by the Florida Supreme Court required reversal of his convictions and a new trial. *Guzman*, 73 F.4th at 1254 (citing *State v. Lucas*, 645 So. 2d 425 (Fla. 1994)). However, while Guzman's federal habeas petition was pending, a new opinion by the Florida Supreme Court held that reversal was not required. *Guzman*, 73 F.4th at 1254–55 (citing *Knight v. State*, 286 So. 3d 147 (Fla. 2019)). Measuring prejudice under *Strickland* against the new opinion by the Florida Supreme Court, *Guzman*, 73 F.4th at 1256, held that the petitioner failed to demonstrate prejudice.

*Davis*, 332 So. 3d at 978, holds that "when a defendant voluntarily chooses to allocute at a sentencing hearing, the sentencing court is permitted to consider the defendant's freely offered statements, including those indicating a failure to accept responsibility." The opinion clarifies that "[l]ack of remorse and failure to take responsibility ordinarily are simply different ways of characterizing the same attitude manifested by a defendant." *Davis*, 332 So. 3d at 974 n.2. The opinion distinguishes *Holton* because a judge at a non-capital sentencing does not weigh aggravating circumstances and mitigating and determines that "*Holton*'s broad, unqualified statement that using a protestation of innocence against a defendant violates due

29

process . . . constitutes dicta that [the court] expressly disapprove[d]." *Davis*, 332 So. 3d at 975.

The opinion explains that, because a defendant who allocates at sentencing waives her right to remain silent, a trial judge does not violate a defendant's rights by considering the statements voluntarily made when imposing a sentence. *Davis*, 332 So. 3d at 977. The opinion further explains that, because Florida law permits a trial judge to impose any sentence up to the statutory maximum sentence, and because due process gives a judge broad discretion to consider different types of evidence at sentencing, a judge may consider whether a defendant takes responsibility for her criminal conduct. *Davis*, 332 So. 3d at 977 (quoting *Williams v. New York*, 337 U.S. 241, 246 (1949)). Also, relying on *United States v. Grayson*, 438 U.S. 41, 44 (1978), the opinion concluded that a judge is "entitled to consider testimony that indicated the defendant's unwillingness to accept the truth and to take responsibility for his own conduct." *Davis*, 332 So. 3d at 978. *See also State v. Burns*, 339 So. 3d 965, 967 (Fla. 2022) ("[U]nder *Grayson*, a judge may evaluate whether a defendant's in-court statements contained falsehoods and, if so, assess that fact along with all of the other sentencing considerations.") (quoting *Grayson*, 438 U.S. at 55).

*Davis*, 332 So. 3d at 977, cites *United States v. Stanley*, 739 F.3d 633 (11th Cir. 2014), to support the holding. The Eleventh Circuit held that "[d]uring sentencing, a court 'may not weigh the exercise of [Fifth Amendment] rights against the defendant[,]' [b]ut a court may take into account a defendant's freely offered statements indicating a lack of remorse." *Stanley*, 739 F.3d at 652 (citations omitted).

30

The Eleventh Circuit explained that "[j]ust as a jury weighs a defendant's testimony once he waives his Fifth Amendment privilege at trial, a judge may consider a defendant's freely offered allocution regarding remorse during sentencing." *Stanley*, 739 F.3d at 652.

The defendant in *Stanley* "chose to allocute at his sentencing hearing without pressure from the court," repeatedly denied any wrongdoing, and refused to accept responsibility by describing himself as not the type of person who commits fraud. *Stanley*, 739 F.3d at 652. At sentencing, when considering factors under 18 U.S.C. § 3553(a), the trial judge noted that the defendant insisted that he had not committed wrongdoing and was not repentant. *Stanley*, 739 F.3d at 644. The Eleventh Circuit rejected a Fifth Amendment claim based on the right against self-incrimination because the defendant "freely chose to profess his innocence at length during his allocution, [and] [t]he district court in no way conditioned his sentence on his decision to exercise his constitutional rights." *Stanley*, 739 F.3d at 653.

Tondreau-Leve voluntarily spoke during her allocution at sentencing, waived her right against self-incrimination and requested leniency to care for her family. She pleaded with the trial judge for a sentence that permitted her to remain home with her children and her elderly father-in-law. (Doc. 8-2 at 887–90) She downplayed her criminal conduct by describing herself as not a "bad person," by describing the criminal conduct as simply a "poor choice," and by lamenting that she was "hurt by a lot of people" and that she no longer knew "who to trust." (Doc. 8-2 at 887, 889–90) She minimized that the jury had found her guilty of serious crimes by

insisting: "If I have to be punished for what I have been **charged for**, I accept that." (Doc. 8-2 at 888) (bolding added)

The trial judge found that she failed to consider the impact of her criminal acts on other persons and showed a general lack of remorse. The trial judge did not condition Tondreau-Leve's sentence on her decision to exercise her constitutional right against self-incrimination. Because under these circumstances, *Davis*, 332 So. 3d at 978, authorizes a judge to consider Tondreau-Leve's failure to accept responsibility at sentencing, Tondreau-Leve fails to demonstrate prejudice under *Strickland*. Consequently, the post-conviction court did not unreasonably deny the claim. *Guzman*, 73 F.4th at 1255–56 (citing *Fretwell*, 506 U.S. at 372).

Ground One is **DENIED**.

Accordingly, Tondreau-Leve's petition (Doc. 1) for a writ of habeas corpus is **DENIED**. The Clerk is **DIRECTED** to enter a judgment against Tondreau-Leve and to **CLOSE** this case.

### DENIAL OF CERTIFICATE OF APPEALABILITY AND LEAVE TO PROCEED *IN FORMA PAUPERIS*

Because Tondreau-Leve neither makes a substantial showing of the denial of a constitutional right nor demonstrates that reasonable jurists would find debatable both the merits of the underlying claims and the procedural issues that he seeks to raise, a certificate of appealability and leave to appeal *in forma pauperis* are **DENIED**. 28 U.S.C. § 2253(c)(2). *Slack v. McDaniel*, 529 U.S. 473, 478 (2000).

**DONE AND ORDERED** in Tampa, Florida on February 9, 2026.

32

MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE